**TWYFORD et al. v. TWYFORD et al.**

Court of Appeals of Kentucky.
Nov. 16, 1951.

Bertram & Bertram, J. M. Kennedy and Bruce H. Phillips, all of Monticello, for appellants.

Fritz Krueger and Russell Jones, Somerset, Hile Pritchard, Albany, J. P. Harrison and Duncan & Duncan, all of Monticello, for appellees.

STANLEY, Commissioner.

The appeal is from a judgment denying specific performance of a contract to convey land. The case is resolved into whether the evidence of a verbal cancellation of the contract is too weak to sustain the burden of proving it. The chancellor held there was such an agreement.

On March 18, 1937, Bolin R. Twyford and his wife, Matilda, executed to their twin sons, C. Beckham Twyford and W. Bryan Twyford, a contract to convey to them a tract containing 1,000 acres, more or less, as described generally by adjacent lands. The deed was to be made as soon as a survey could be had "not later than September 1, 1937." The consideration was $10,000, payable $500 in cash, the assumption of a $3,000 mortgage, and the execution of six promissory notes, the last of which matured seven years after date. The two sons took possession of the land, each cultivating a separate part and mak-

ing improvements thereon though both testified there was no agreed partition. Bryan paid the balance of one-half of the purchase price in 1944, but no deed was then executed. In November, 1947, it appeared the government would require a substantial part of the land for the Wolfe Creek Dam project on Cumberland River. Upon Bryan's request, his parents executed to him a deed on November 20, 1947, for a one-half, undivided interest in the whole tract. In September, 1948, Beckham tendered payment of $6,800, the sum he calculated was the balance due by him and demanded a deed to the other undivided half; but his parents refused to execute it upon the ground that the trade with Beckham had been mutually rescinded and the contract cancelled. In the creation of Cumberland Lake by the erection of the dam, 658.2 acres were taken, and the sum of $36,600 was paid into court. The survey for this purpose revealed that the tract covered by the title bond contained 1,285.2 acres. This unexpected windfall seems to have brought on the suit in which Beckham Twyford seeks to require his parents to execute a deed to him.

The evidence is contradictory on the issue of mutual rescission. A full recitation of it would be of little service, so only a brief summary of the most material part will be given.

The father and mother testified unequivocally that in July, 1941, Beckham stated he did not want the land and asked his father to take it back. The circumstances and statements of the parties are related in detail. They seem to be natural and reasonable and bear the mark of probability and truth. Beckham then executed to him a bill of sale for his farm tractor (on which there was a mortgage for $765) and other equipment for $1,500. About this time Beckham went to Louisville and stayed a short while with his sister, Mrs. Huffaker, while prospecting for a small business. He told her he had "turned the land on the creek back to dad;" had conveyed him his other land and equipment and settled with his father; that he had not made anything on the land and intended to

to Illinois where his brother Alonzo lived. He told his brother that he had returned the land to his father and did not intend to go back. Beckham settled there and prospered. His father became his surety on a note for $3,000 in order that he might go into business, and to indemnify him Beckham deeded him a tract of 170 acres adjoining the land in controversy. Nearly two years after he left home, Beckham wrote his mother two letters, one in March, 1943, in reply to a letter from his mother in which she apparently had referred to the land. It is quite long and contains much that is irrelevant here, but Beckham wrote, "Of course, I would like to have my ½ interest in that land, but I wouldn't want ½ like I had when I was down there." He expressed resentment over the way he had been treated by his brother in the joint occupancy of the land. A significant statement referring to his father and brother is, "They can do just whatever they want to do about it." Another statement is, "I am going pretty good and I'll just stay here for we are all perfectly satisfied." In the second letter he referred to his personal affairs and successes in farming and carpentering. He asked, "Why don't dad pasture ½ and cultivate his land up there?" There are some other significant statements, such as, "Dad don't have any use for that creek land you will just have to do the best you can about it."

It seems that after Beckham left in 1941, the partition of the land which had been indefinitely agreed upon by him and Bryan was accepted by the father and Bryan. The father hired hands to operate that part of it or rented some of it from time to time and received and held the rents as his own. In all this he was often assisted by Bryan. The father paid the expenses of maintenance during the years and all taxes on the whole tract after he had executed the title bond in 1937, with the exception of 1939. These expenditures are proved by record evidence. Some time in 1944, when Beckham had paid off the $3,000 debt on which his father was surety, the father reconveyed him the 170 acre tract. It appears that Beckham made no claim to an interest in the other land.

On the other side, Beckham testified that he had never agreed to a rescission of the contract and never knew until 1948 that his father was making such a claim. He made categorical denial of the statements attributed to him by his father, mother, sister and brother. It appears the two sons satisfied the mortgage debt of $3,000 they assumed and made some improvements. Over against this is the fact that they were receiving the products of the land, and the value of some improvements was taken into consideration in the settlement when Beckham was preparing to leave in 1941. Beckham testified he came back from Illinois two or three times a year to "see how things were getting along" with the farming operations. His testimony does not disclose any substantial activity. Beckham points to the fact that his notes executed in 1941 had never been returned to him.

Bryan, who is a party to the suit and favorable to Beckham's cause, testified that he never heard of Beckham returning his part of the land to his father or of his father claiming he had done so. However, he had never recognized Beckham in the operations. In paying his half of the purchase price and in accepting his separate deed, he acted for himself alone without any indication that he was paying any sum for Bryan or that Bryan had any interest in the land. Concerning the failure to deliver Beckham's notes back to him, it is not denied that the father told Bryan when he had made his final settlement that the joint notes were in the office of attorney Parker Harrison and he could go get them at any time. He had also told Beckham he could get the notes from Mr. Harrison.

There is other testimony tending to support the respective contentions. But the evidence of the father is strongly supported by these undeniable and potent facts: (1) In 1941 there was a settlement of accounts and Beckham left the state and established himself in business in Illinois, and, as we regard the evidence, never did anything to show a proprietary interest in the land in Wayne County for seven years, or until it suddenly became valuable; (2) the father treated the land, or one-half of it, as his own and operated it by and with the assistance

of the other son, Bryan, and paid the taxes thereon; and (3) the significant statements in the letters to Mrs. Twyford written in 1943.

 We recognize that strong and convincing evidence is required to prove an oral revocation of a written contract, especially where the party denying it was put in possession of land covered by the contract. Keeney v. Waters, 135 Ky. 525, 122 S.W. 837; Dehlinger v. Graue, 238 Ky. 461, 38 S.W.2d 246. But the rule is not so strict as to require that the claim of rescission be established without contradiction or beyond a reasonable doubt, for the evidence may be of convincing quality if it is from a credible source or is supported by circumstances consistent and sure. Glass v. Bryant, 302 Ky. 236, 194 S.W.2d 390.

The facts in Glenn v. Lowther, 219 Ky. 383, 293 S.W. 947, 949, may be regarded as more extreme than the present because the insolvency of the purchasers of land under a title bond and their transferees were important factors on the issue of abandonment of the contract. But the law of the case is applicable here. It is, briefly stated, that abandonment of such a contract may be inferred from circumstances or conduct inconsistent with an intention to perform; that equity will not permit a party to sleep over his rights to the prejudice of another on whom he makes claim, and that he must make a demand within a reasonable time for performance. More specifically it is written, "A purchaser may not lie by and lead the other party to believe that he has abandoned the contract, and then, when the land has increased in value 20 times, claim the benefit of the contract he decided not to claim before the land rose in value." And equally pertinent to the present case is the following quotation from Hennessey v. Woolworth, 128 U.S. 438, 442, 9 S.Ct. 109, 111, 32 L.Ed. 500: "Specific performance is not of absolute right. It rests entirely in judicial discretion, exercised, it is true, according to the settled principles of equity, and not arbitrarily or capriciously, yet always with reference to the facts of the particular case."

To this may be added "that a party seeking specific performance must show that he has performed or offered to perform or is ready, able, and willing to perform all the essential acts required by the contract." Faulkner v. Denniston, 250 Ky. 373, 63 S.W.2d 286, 288. There was a partial performance by Beckham in the early years by payment of his half of the cash consideration and the assumed mortgage debt, but that appears to have been taken into consideration in the settlement between his father and himself when he went away. He did nothing more. The case presents proof of laches and a failure to offer to perform by paying the balance of the consideration until ten years had elapsed.

We are of opinion that the chancellor properly denied the relief sought.

The judgment is affirmed.